64 F.3d 82
 1995 A.M.C. 2829
 AQUARIUS MARINE CO., Plaintiff-Appellee,
v.
Federico F. PENA, as Secretary of Transportation of the
United States; Albert J. Herberger, as Maritime
Administrator United States Department
of Transportation, Defendants-Appellants,
Shipbuilders Council of America, et al.,
Intervenor-Defendants-Appellants.
 Nos. 1153, 1381, Dockets 94-6222, 94-6224.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 16, 1995.
Decided Aug. 24, 1995.
 
 Jeffrey Clair, Washington, DC, (Frank W. Hunger, Asst. Atty. Gen., Robert S. Greenspan, Dept. of Justice, Washington, DC, Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY, on the brief), for defendants-appellants.
 Jonathan Blank, Washington, DC (Lisa M. Helpert, Preston Gates Ellis & Rouvelas Meeds; Andrew J. Simons, A. Kathleen Tomlinson, Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P.C., Uniondale, NY; Scott Himes, Stillman, Friedman & Shaw, P.C., New York City, on the brief), for intervenor-defendants-appellants.
 Mark P. Schlefer, Washington, DC (T.S.L. Perlman, Fort & Schlefer, on the brief), for plaintiff-appellee.
 Before: MINER, JACOBS and LEVAL, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 This appeal is taken by the Secretary of Transportation and various private intervenors from an order of the United States District Court for the Eastern District of New York (Platt, Judge ), which vacated and remanded a final order of the Maritime Administrator of the Department of Transportation ("Administrator"). The issue on appeal is whether the Administrator was arbitrary and capricious in concluding that a vessel owned by plaintiff Aquarius Marine Co. ("Aquarius") had been "rebuilt" in a foreign shipyard within the meaning of the Cargo Preference Act, sections 901(b)(1) and 901b, Merchant Marine Act of 1936, 46 U.S.C.App. Secs. 1241(b)(1) and 1241f, and was therefore ineligible to carry certain government-sponsored cargo. Believing that the Administrator's construction of the statute was a permissible one, we reverse the judgment of the district court.
 
 I. Background
 
 2
 A. The Golden Monarch's Alterations and the Coast Guard Ruling
 
 
 3
 Aquarius owns the Golden Monarch, a bulk carrier vessel designed and built in 1975 as a tanker. She has at all times sailed under the United States flag. From 1977 to September 1992, the Golden Monarch carried primarily oil cargo. In late 1992, however, the Coast Guard inspected the vessel and concluded that she could not be recertified as a tanker without extensive repairs. Rather than make these costly repairs, Aquarius relinquished the vessel's tanker certification and modified her to carry grain cargoes. These modifications were undertaken in U.S. shipyards and entailed adding small hatches to facilitate grain loading, and removing certain apparatus used for oil transport. The Coast Guard certified the vessel for grain cargoes in November of 1993.
 
 
 4
 During 1993, Aquarius designed more extensive modifications to the Golden Monarch intended to improve her efficiency and competitiveness in the dry bulk grain trade. In her then-existing condition, the vessel was at a disadvantage because some businesses and federal agencies would not ship grain on vessels with a tanker configuration, and because some ports would not allow tankers to unload cargo at the dock, making unloading more costly and time-consuming. The proposed modifications included reconfiguring the cargo holds throughout the ship, cutting larger hatches in the main deck, providing new hatch covers, coamings, and doubler plates, removing cargo pumps, and relocating pipes and wires. These alterations affected mainly the cargo hold; the outer hull and superstructure were not to be altered. All told, 1,380 long tons of steel were to be removed, and 953 long tons of steel to be installed; the tonnage of the new steel would equal eight percent of the original hull weight. Aquarius solicited bids for the work from several shipyards around the world. The bids ranged in price and dry-dock time from $6 million and 90 days in a South Korean shipyard, to $11.5 million and 200 days in a U.S. shipyard.
 
 
 5
 Before selecting a contracting yard, Aquarius needed to investigate whether the performance of the work abroad would disqualify the vessel from United States coastwise trade (being trade between U.S. ports). Section 27 of the Merchant Marine Act of 1920, 46 U.S.C.App. Sec. 883, generally referred to as the "Jones Act," reserves the coastwise trade for vessels owned by U.S. citizens and built in the United States. The Jones Act permanently disqualifies from domestic trading any vessel originally built in the United States that is later "rebuilt" in a foreign country.[1] Administration of the Jones Act falls in part to the Coast Guard, which issues qualifying certificates. The Coast Guard defines a vessel as "rebuilt" "when any considerable part of its hull or superstructure is built upon or substantially altered." 46 C.F.R. Sec. 67.177(a) (1993).
 
 
 6
 Aquarius requested a preliminary ruling by the Coast Guard on whether the performance of the work in the South Korean shipyard would disqualify the vessel from coastwise trade. In January 1994, the Coast Guard issued a preliminary ruling that the proposed alterations would not be deemed a "rebuilding" under the Jones Act, so that the Golden Monarch would remain eligible. Upon receipt of this decision, Aquarius entered into a contract with the low-bidding South Korean shipyard.
 
 B. The Maritime Administration's Ruling
 
 7
 Section 901(b) of the Cargo Preference Act of 1954, 46 U.S.C.App. Sec. 1241(b)(1), a protectionist statute enacted as an amendment to the Merchant Marine Act of 1936, reserves 50 percent of certain foreign-bound, government-sponsored cargo for "privately owned United States-flag commercial vessels." Id. The statute defines "privately owned United States-flag commercial vessels" to exclude "any vessel which ... shall have been ... rebuilt outside the United States ... until such vessel shall have been documented under the laws of the United States for a period of three years." 46 U.S.C.App. Sec. 1241(b)(1). Thus, like the Jones Act, the Cargo Preference Act disqualifies merchant marine vessels "rebuilt" abroad from certain trade. The disqualification under the Cargo Preference Act, however, is less severe than under the Jones Act, as it is limited to three years and applies to only certain types of cargoes. See id. The Maritime Administration ("MarAd"), a subdivision of the U.S. Department of Transportation, has responsibility for determining which vessels qualify for U.S. cargo preferences under the Act. 49 C.F.R. Secs. 1.4(j)(8) & 1.66(e).
 
 
 8
 As the work was beginning in the South Korean yard, Aquarius requested a ruling by MarAd as to whether the reconfigured ship would remain eligible for preference in awards of government shipping contracts under Sec. 901(b). On April 15, 1994, the Administrator of MarAd issued a ruling finding that the conversion of the Golden Monarch constituted a "rebuilding" within the meaning of the Cargo Preference Act, and that the vessel was therefore disqualified from the preference cargo trade for three years.
 
 
 9
 The Administrator first noted that the Cargo Preference Act did not define the term "rebuilt," or address whether the conversion of a ship from one type to another (e.g., from an oil tanker to a dry bulk carrier) would constitute a "rebuilding." MarAd therefore looked to its longstanding policy governing the "reconstruction" of ships for purposes of granting construction differential subsidies and government-guaranteed financing of ship work under other provisions of the Merchant Marine Act of 1936.[2] MarAd's policy manual defined "reconstruction" under these programs as "a conversion of a ship requiring extensive structural and physical changes." Opining that there was no meaningful distinction between a "reconstruction" and a "rebuilding," MarAd concluded that, because the conversion work to the Golden Monarch involved extensive changes and would constitute a "reconstruction" for purposes of the subsidy program, it also constituted a "rebuilding" under the Cargo Preference Act.
 
 
 10
 MarAd thus declined to follow the Coast Guard definition of "rebuilt" as having "any considerable part of [the] hull or superstructure [ ] built upon or substantially altered," or to conform its eligibility determination to that reached by the Coast Guard under the Jones Act. Citing the observation of Keystone Shipping Co. v. United States, 801 F.Supp. 771, 785-786 (D.D.C.1992) that MarAd had "abdicated its responsibility" in another case by adopting Coast Guard findings without conducting an independent assessment of the controlling statute, the agency concluded that it would base its decision on the cumulative impact of the structural, outfitting, and functional changes to the vessel.
 
 
 11
 Furthermore, in reviewing the legislative history of Sec. 901(b), MarAd concluded that, in disqualifying vessels rebuilt abroad, Congress intended to (1) preserve work for U.S. shipyards, and (2) protect the domestic merchant marine against competition from vessels that have been enlarged and made more efficient in low-cost foreign shipyards. The Administrator determined that the disqualification of the Golden Monarch would further these protectionist purposes.
 
 
 12
 In a subsequent decision, the Administrator ruled that the Golden Monarch was also ineligible for preference cargoes falling under a later amendment to the Merchant Marine Act known as the Food Security Act of 1985, 46 U.S.C.App. Sec. 1241f (1988). The Food Security Act reserves an additional 25 percent of certain agricultural cargoes to U.S.-flag ships. MarAd determined that the three-year foreign-rebuilt exclusion of Sec. 901(b) applies also to shipping contracts obtained under the Food Security Act.
 
 C. The District Court's Ruling
 
 13
 Aquarius instituted this action as a petition for judicial review of MarAd's decision pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. Secs. 701-706. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). The Shipbuilders Council of America and various competing shipping companies intervened as party-defendants in support of the government's position.
 
 
 14
 The district court conducted a hearing and on August 31, 1994, vacated the ruling of the Administrator on the ground that MarAd's interpretation of "rebuilt" was an impermissible construction of the Cargo Preference Act. The court found three flaws in MarAd's ruling. First, it criticized MarAd for emphasizing the functional conversion from a tanker to a dry bulk carrier. Judge Platt stated, "the plain meaning of the term rebuilt connotates a near total restoration of a thing to its prior condition or to a substantially different state.... By focusing on the functionality of the changes made to the vessel rather than their breadth and substance, MarAd's interpretation of rebuilt does violence to the plain meaning of the statute...." (internal quotation marks and footnote omitted).
 
 
 15
 Second, the court held that MarAd had erred in equating a "rebuil[ding]" in the Cargo Preference Act with the term "reconstruction" as used in other portions of the Merchant Marine Act. Invoking the maxim that Congress ordinarily intends to ascribe different meanings to different terms in a statute, the court found that "the statutory scheme evidences a clear legislative intent that the term 'rebuild' should be read more narrowly than 'reconstruction.' "
 
 
 16
 Third, the court concluded that, in the absence of indications of contrary congressional intent, like terms in the maritime laws should be construed in pari materia. Since the "rebuilt" exclusions of the Jones Act and the Cargo Preference Act used the same term to accomplish a similar purpose, the court reasoned that the term should be interpreted congruently as between the two statutes.
 
 
 17
 The district court extended a previously entered preliminary injunction against the Golden Monarch's disqualification and remanded the case with instructions that MarAd reconsider her eligibility for cargo preferences. The existing preliminary injunction also enjoined the intervenors from lobbying government agencies to exclude the Golden Monarch from the preference trade. The court declined to rule on the vessel's eligibility for cargoes falling under the Food Security Act until such time as MarAd issued a new determination with respect to her status under Sec. 901(b). This appeal by the government and the intervenors followed.
 
 II. Discussion
 A. Jurisdiction
 
 18
 As a threshold matter, Aquarius claims that this court lacks jurisdiction over the appeal of the intervenor shipping companies. This is so, Aquarius argues, because the district court's remand to MarAd is not a final decision insofar as intervenors are concerned. The argument has no merit. The district court's injunction bars the intervenors from seeking to disqualify the Golden Monarch from consideration for preference cargoes. Section 1292(a)(1) of Title 28 allows appeals from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions." Because the intervenors contest the district court's order continuing its injunction, this court has jurisdiction over the appeal.
 
 B. The Merits
 
 19
 Congress enacted two parallel statutes, each of which imposes separate disqualifications upon vessels that have been "rebuilt" in foreign yards. One statute it entrusted for interpretation and enforcement to the Coast Guard, the other to MarAd. Using different interpretive guides, these two agencies have come to conflicting conclusions as to whether a single set of modifications constituted a rebuilding done in a foreign shipyard.
 
 
 20
 Were we required to determine which agency's definition was preferable, or which came to the right conclusion as to whether the Golden Monarch had been rebuilt, we might find this a difficult case. But we are not called upon to make those decisions. Our review is limited to determining whether MarAd's interpretation was arbitrary, capricious, an abuse of discretion, or contrary to law. See 5 U.S.C. Sec. 706(2)(A). We cannot make such a finding.[3]
 
 
 21
 On appeal from a district court's review of a claim of violation of the Administrative Procedure Act, we give no deference to the lower court; we review de novo whether the agency action satisfies the standards of the APA. Ward v. Brown, 22 F.3d 516, 521 (2d Cir.1994). In other words, we review the record to determine whether the agency considered the relevant factors and acted within its discretion. Perales v. Sullivan, 948 F.2d 1348, 1353 (2d Cir.1991).
 
 
 22
 Aquarius argues that, because the "rebuilt" exclusions of the Cargo Preference and Jones Acts were passed with the same protectionist goal of shielding the U.S. shipping industry from foreign competition, they should be interpreted consistently; that MarAd erred in assigning the same meaning to "reconstruction" and "rebuilding"; that MarAd's interpretation carries protectionism to abusive extremes, beyond the intention of the statute, in circumstances where the performance of the work in the United States would be so expensive that owners would be obliged to scrap the vessel rather than incur such costs; that disqualification of the Golden Monarch was arbitrary, because the conversion to dry goods carriage was performed in the United States in 1992, when it underwent initial modifications and first obtained dry carriage certification; and that MarAd overstated the extent of the later Korean alterations, which did not in fact amount to "a conversion of a ship requiring extensive structural and physical changes."
 
 
 23
 We find various flaws in the arguments advanced by Aquarius. Furthermore, irrespective of the wisdom of protectionist legislation like the Cargo Preference Act, which of course is not our concern, we can find no reason to doubt that MarAd acted lawfully within the parameters set by Congress.
 
 
 24
 1. Congress did not impose a requirement of uniformity
 
 
 25
 Section 901(b) does not define or specify the factors to be used in determining whether a vessel has been "rebuilt." See 46 U.S.C.App. Sec. 1241(b)(1). Both Aquarius and the government offer statements by legislators and various amendments to the statutes to support their reading of the legislative history. In support of its view that 901(b) should be interpreted consistently with the Jones Act, Aquarius points out that the foreign-rebuilt exclusions in the Jones and Cargo Preference Acts were adopted in their present form within successive sessions of Congress.[4] Indeed, the rebuilt exclusion was added to the Cargo Preference Act in 1961 to afford U.S. vessels engaged in international trade and U.S. shipyards the same protection against foreign-generated competition provided a year earlier under the Jones Act with reference to the coastwise trade.[5]
 
 
 26
 Nonetheless, we cannot conclude that Congress required the two provisions be interpreted synonymously. There are textual differences in the two acts suggesting that Congress was not seeking absolute congruity. For example, the Jones Act sentence in which "rebuilt" appears makes specific reference to the hull and superstructure, while the Cargo Preference Act contains no such reference. Compare 46 U.S.C.App. Sec. 883 with 46 U.S.C.App. Sec. 1241(b)(1).
 
 
 27
 Moreover, non-uniform rulings are not surprising given the differences in the regulatory structure of the Jones and Cargo Preference Acts. The statutes apply to different shipping trades (one private and essentially domestic; the other consisting of government-sponsored and subsidized cargoes destined for foreign ports), they are administered by different governmental agencies, and they impose significantly different sanctions. As MarAd and the Coast Guard have been delegated authority over laws governing different aspects of the maritime trade, they have discretion to undertake independent interpretations of the same term in different statutes. Cf. Abbott Labs. v. Young, 920 F.2d 984, 987 (D.C.Cir.1990) ("[I]t is not impermissible under Chevron for an agency to interpret [the same] imprecise term differently in two separate sections of a statute which have different purposes."), cert. denied, 502 U.S. 819, 112 S.Ct. 76, 116 L.Ed.2d 49 (1991). Even if uniformity were required, we see no reason why the Coast Guard's definition of "rebuilt" should prevail over the definition preferred by MarAd. In our view, it is not unreasonable for the Coast Guard to interpret in more lenient fashion a statute that imposes a permanent disqualification on offending vessels, while the Maritime Administration interprets more stringently a similar provision that imposes only a temporary disability. Furthermore, Congress could have defined "rebuilt" in the Cargo Preference Act by reference to the Jones Act (as it did for another section, cf. 46 U.S.C. Sec. 12101(a)(2) (for purposes of vessel documentation laws, term "rebuilt" has same meaning as under the Jones Act)), but chose not to.
 
 
 28
 In any event, the deferential standard of review which governs under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), was intended to restrain courts from unnecessary attempts to penetrate the mind of Congress when reviewing ambiguous statutory language. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2781-82. Where the agency's construction is a permissible one, that construction must control. Id.
 
 
 29
 We therefore examine whether MarAd's construction of Sec. 901(b) was permissible, and whether its exclusion of the Golden Monarch under that construction was reasonable.
 
 2. MarAd's definition is permissible
 
 30
 a. Plain meaning
 
 
 31
 We believe that MarAd's interpretation of Sec. 901(b) is a permissible reading of the statute. To define "rebuilt" in the context of the maritime laws as a "a conversion of a ship requiring extensive structural and physical changes" is consistent with the common usage and the dictionary meaning of that term. See Webster's Third New International Dictionary 1893 (1976) (defining "rebuild" as "to make extensive repairs to including the replacement of missing or defective parts: reconstruct ... to make extensive changes in"). Although "rebuild" can also mean a "near total restoration," as the district court found, that is not the only plausible definition of that term. See MCI Telecommunications v. AT & T Corp., --- U.S. ----, ----, 114 S.Ct. 2223, 2229, 2231, 129 L.Ed.2d 182 (1994) (agency has authority to choose among alternative definitions unless its choice "goes beyond the meaning that the statute can bear").
 
 
 32
 b. Consistency with a parallel statute
 
 
 33
 We cannot say it was impermissible for MarAd to equate "rebuild[ing]" with a "reconstruction." The pertinence of "reconstruction" relates to Congress's provision of "construction differential subsidies" to be provided "in exceptional cases" to help finance reconstruction work done in U.S. shipyards. 46 U.S.C.App. Sec. 1151(a) & (c). It is unclear whether Congress intended such subsidies only for precisely the same categories of work that would result in disqualification from coastwise trade and cargo preferences. What is clear, however, is that Congress intended to give the Secretary of Transportation considerable authority to determine when such subsidies should be found to further "the purposes and policy of this chapter." 46 U.S.C.App. Sec. 1151(c). Although it is not clear that Congress intended construction differential subsidies to be available only in cases that would result in disqualification under the Cargo Preference Act, we cannot say that the agency abused its discretion in construing the two terms as synonymous.[6]
 
 
 34
 c. Consistency with Congress's manifest objective
 
 
 35
 MarAd's interpretation is undoubtedly consonant with the stated policy of the Cargo Preference Act. If any fact emerges undisputed from the legislative history, it is that Congress added the rebuilt exclusion to the Cargo Preference Act out of concern that U.S.-flag vessels rebuilt and enlarged abroad at low cost were squeezing smaller, American-built ships out of the preference trade. See S.Rep. No. 667, 87th Cong., 1st Sess. 2-3 (1961), reprinted in 1961 U.S.C.C.A.N. 2806, 2807-08. MarAd's more expansive definition of a "rebuilt" ship obviously tends to further the protectionist intent of the statute. See Keystone Shipping Co. v. United States, 801 F.Supp. 771, 785-86 (D.D.C.1992) (maritime agency must take into account policy behind statutes it construes).
 
 3. The work performed on the Golden Monarch
 
 36
 The work performed on the Golden Monarch in Korea was of a significant magnitude, worth several millions of dollars. While we do not imply that the cost of shipyard renovations is alone determinative of whether a "rebuilding" has occurred, MarAd was plainly permitted to conclude that the "rebuilt" exclusion encompassed foreign contracting for so extensive a renovation. The fact that the vessel's technical "conversion" to a grain carrier had previously occurred in the U.S. does not make irrelevant the significant renovations later performed in South Korea.[7] Again, MarAd's exclusion of the Golden Monarch based on the performance of such work abroad furthers the statutory goal of protecting the competitiveness of the American-built merchant fleet, by discouraging owners from taking their rebuilding business abroad and then using their vessels' enhanced capacity and lower operating costs to compete for U.S. government business. Aquarius does not deny that the renovations had the effect of reducing the Golden Monarch's operating costs, enlarging its usable cargo capacity, and opening new trading markets.
 
 
 37
 Aquarius' contention that it would not in any case have employed an American shipyard because the U.S. bids were prohibitively expensive is immaterial for purposes of our review. If vessel owners could escape the disqualification for foreign rebuilding because more expensive U.S. yards are uneconomical, the protectionist objective of Sec. 901(b) would be defeated. Aquarius' argument essentially reduces to a grievance that the federal government's incentives (in the form of reserved cargoes and premium shipping rates for American-built ships) are insufficient to induce vessel owners to patronize U.S. shipyards. This may be so. Nonetheless, Congress entrusted to MarAd, not to the courts, the authority to implement its protectionist policies by determining the extent of foreign alterations that would trigger disqualification.
 
 
 38
 In so concluding, we do not endorse MarAd's interpretation of the Cargo Preference Act over the Coast Guard's interpretation of the Jones Act. We merely hold that MarAd was within its power to construe the rebuild exclusion of Sec. 901(b) as it did. Under the deferential standard of review that governs, we cannot say that MarAd abused its discretion in declining to rule consistently with the Coast Guard.
 
 4. Food Security Act
 
 39
 Finally, Aquarius reasserts the argument, originally pressed in the district court, that it is immediately eligible to carry preference cargo under the 25 percent incremental reservation provided in the Food Security Act, 46 U.S.C.App. Sec. 1241f. Aquarius contends that the criteria for carriage under this provision are set forth exclusively in section Sec. 1241o, which requires only that a vessel be (1) U.S.-flagged, (2) "necessary for national security," and (3) under 25 years old (unless specially certified by the Secretary of Transportation). 46 U.S.C.App. Sec. 1241o. Aquarius argues that MarAd erroneously applied the foreign rebuild exclusion of Sec. 901(b) to cargoes allocated under Sec. 1241f.
 
 
 40
 This claim is without merit. Subsection 1241f(c)(1) specifies that the requirements for transporting agricultural goods under the Food Security Act are "subject to the same terms and conditions as provided in section 1241(b) [Sec. 901(b) ] of this title." We read the three requirements set forth in Sec. 1241o as supplementing, rather than supplanting, this language, which otherwise would be rendered inoperative. See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594-95, 86 L.Ed.2d 168 (1985). Given this explicit reference to the terms and conditions of Sec. 901(b), MarAd's finding that the three-year exclusion of ships rebuilt abroad also applies to Food Security Act cargoes is neither arbitrary, capricious, nor an abuse of discretion.
 
 Conclusion
 
 41
 For the foregoing reasons, the judgment of the district court is reversed and the order of the Maritime Administration is affirmed.
 
 
 
 [1]
 [N]o vessel which has acquired the lawful right to engage in the coastwise trade, by virtue of having been built in or documented under the laws of the United States, and which has later been rebuilt, shall have the right thereafter to engage in the coastwise trade, unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States, its Territories (not including trust territories), or its possessions
 46 U.S.C.App. Sec. 883.
 
 
 [2]
 These government programs, which subsidize shipbuilding and reconstruction undertaken in American shipyards, are authorized under 46 U.S.C.App. Secs. 1151-61 & 1271-1280a
 
 
 [3]
 In addition, the use of prior authority to illuminate the meaning of "rebuild" is hazardous because the word has been defined in different contexts, giving rise to quite different policy considerations. The definition adopted by the Coast Guard--"when any considerable part of its hull or superstructure is built upon or substantially altered"--was adapted from The Grace Meade, 25 F.Cas. 1387 (E.D.Va.1876). In that case, the United States sought forfeiture of the tug Grace Meade pursuant to a statute that forbade changing the name of steam vessels. The purpose of the statute was "the Prevention and Punishment of Frauds in Relation to the Names of Vessels." Act of May 5, 1864, Chap. 78, 13 Stat. 63, 64. The United States contended that the Grace Meade was in reality, notwithstanding change of name, the Agnes, which had previously exploded. The Grace Meade had been built by the Agnes's owner according to the same design and using some of the Agnes's salvaged timbers and parts. The question was "whether ... the Grace Meade is a new vessel [in which case she was not subject to forfeiture], or the old vessel rebuilt [in which case she could be forfeited for changing her name from Agnes to Grace Meade]." Id. at 1389. In holding the Grace Meade to be a new vessel, not subject to forfeiture, the court observed that:
 [W]here the keel, stem, and stern-posts and ribs of an old vessel, without being broken up and forming an intact frame, are built upon as a skeleton, the case is one of an old vessel rebuilt, and not of a new vessel.... [I]f any considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up, is built upon, the law holds that in such a case it is the old vessel rebuilt, and not a new vessel.
 Id.
 Recognition of the context in which the definition arose shows that the issue presented very different (indeed, opposite) policies from those we consider here. The policy of the maritime law at issue in The Grace Meade was, in order to prevent various frauds, "very strongly to discourage a change of the names of vessels." Id. In that context, the less of the old vessel that survived in the new, the less likely it was to be considered "rebuilt." The court observed, "it would be idle to pretend that ... the use of so small a portion of the material of one vessel made the new one the same as the old." Id. "Rebuilt" in that context meant that the reconstruction had been sufficiently trivial that the old vessel, rebuilt, survived in the new. Here, the policies being enforced lead in the opposite direction. The less of the old vessel that survives, the more likely it is to be considered rebuilt.
 The issue was further complicated in The Jack-O-Lantern, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922), where the Supreme Court cited the standard of The Grace Meade with approval. In The Jack-O-Lantern, a shipyard libeled a vessel in admiralty to recover for work performed on her. The question was whether the admiralty court had jurisdiction over the work. The law provided that a contract for new ship construction was not maritime, while a contract for ship repairs (or rebuilding) was. The work in question had been to convert a railroad barge without power or steering into a steamer for amusement purposes with a dance floor and a large new superstructure. The entire hull had been retained. Quoting the language of The Grace Meade, the Court held that, by reason of the intact survival of the hull, this was a case of rebuilding as opposed to new construction, and upheld maritime jurisdiction. Id. at 100, 42 S.Ct. at 244.
 Once again, the more of the old vessel that survived, and the smaller the changes, the more likely the conclusion that the vessel was rebuilt. For the issue in both cases was to distinguish between a completely new vessel and an old vessel that had been rebuilt. Here, by contrast, the issue is to distinguish a rebuilding from less consequential changes. The smaller the changes, the less likely the conclusion that the vessel has been rebuilt. Given these differences, the precedents are of very limited value for either adjudication or rulemaking.
 
 
 [4]
 The present version of the "rebuilt" abroad exclusion was added to the Jones Act in 1960. Pub.L. No. 86-583, Sec. 1, 74 Stat. 321 (1960). The rebuilt abroad language in the Cargo Preference Act was adopted the following year, in 1961. Pub.L. 87-266, 75 Stat. 565 (1961)
 
 
 [5]
 [W]hen the Congress was advised that vessels were being reconstructed in the United States with midbodies built in foreign yards, legislation was enacted which denied coastwise privileges to such ships.... It was believed that American shipyards, American shipowners, and American labor were thus somewhat protected from foreign-built and foreign-rebuilt ships, but now it appears that the legislation cited has not deterred these ships from being documented under our flag in order to compete with American-flag vessels for 50-50 cargoes. Enactment of the proposed bill would close this loophole and thus make more effective the long and often expressed policy of maintaining an American-built as well as American-owned merchant marine
 S.Rep. No. 667, 87th Cong., 1st Sess. 2-3 (1961), reprinted in 1961 U.S.C.C.A.N. 2806, 2808.
 
 
 [6]
 We do not agree with the government's argument that 46 U.S.C.App. Sec. 1185 demonstrates that the terms are synonymous. This statute temporarily authorized the Secretary of Commerce, in the absence of available funds for construction differential subsidies, to "authorize an operator ... to ... reconstruct ... its vessels ... in a foreign shipyard." 46 U.S.C.App. Sec. 1185(a). The statute then provides that "[v]essels constructed, reconstructed, or modified pursuant to this section shall be deemed to have been United States built." Id. The government argues that the last-quoted proviso would be unnecessary unless reconstruction were equated with rebuilding. The argument makes no sense. So long as the reconstruction undertaken in the foreign yard was capable of being considered a rebuilding that would occasion disqualification, Congress had reason to assure shipowners that the authorization granted by the Secretary of Commerce would not later cause disqualification from cargo preferences. This reassurance does not necessarily demonstrate that no subsidies could be given except in cases that would cause disqualification
 
 
 [7]
 We believe that Aquarius and the district court overstate MarAd's emphasis on the fact of conversion. MarAd's articulated standard--"a conversion ... requiring extensive structural and physical changes"--suggests an equal emphasis on functional and physical alterations, and nothing in the Administrator's opinion is to the contrary