517 S.E.2d 763

**WHEELING–PITTSBURGH STEEL CORPORATION, Appellant Below, Appellant,**

v.

**Kyu Chong ROWING and West Virginia Human Rights Commission, Appellee Below, Appellee.**

No. 25825.

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1999.

Decided July 16, 1999.

Sandra K. Law, Esq., Aimee L. Morgan, Esq., Schrader Byrd & Companion, PLLC, Wheeling, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Attorney General, Mary Catherine Buchmelter, Deputy Attorney General, Charleston, West Virginia, Attorneys for West Virginia Human Rights Commission.

Allan N. Karlin, Esq., Morgantown, West Virginia, Attorney for all Amici Curiae.

Jane E. Peak, Esq., Allan N. Karlin & Associates, Morgantown, West Virginia, Attorney for AARP and all Amici Curiae.

Franklin D. Cleckley, Esq., Morgantown, West Virginia, Attorney for amicus curiae, West Virginia State Conference of Branches of the NAACP.

Ron L. Tucker, Esq., Fairmont, West Virginia, Attorney for amicus curiae, West Virginia State Conference of Branches of the NAACP.

Grant Crandall, Esq., Charleston, West Virginia, Attorney for amicus curiae, United Mine Workers of America.

William B. McGinley, Esq., Charleston, West Virginia, Attorney for amicus curiae, West Virginia Education Association.

Christine M. Hedges, Esq., Spencer, West Virginia, Attorney for amicus curiae, West Virginia Chapter of the National Organization for Women.

Thomas Patrick Maroney, Esq., Charleston, West Virginia, Attorney for amicus curiae, West Virginia AFL–CIO.

McGRAW, Justice:

Appellant, Wheeling–Pittsburgh Steel Corporation ("Wheeling–Pittsburgh"), appeals the Circuit Court of Kanawha County's affirmance of the final decision of the West Virginia Human Rights Commission ("HRC" or "Commission"), which found that Wheeling–Pittsburgh violated the West Virginia Human Rights Act (the "Human Rights Act"), W. Va.Code §§ 5–11–1 to –19, by discriminating against an employee on the basis of national origin. Wheeling–Pittsburgh asserts that the circuit court erred in failing to reverse the action of HRC, arguing that the Commission (1) was barred from acting on the employee's complaint based upon the exclusivity and/or preclusive effect of previous grievance proceedings, (2) erroneously determined that Wheeling–Pittsburgh failed to meet its burden of production; and (3) failed to treat a statement contained in the employee's complaint as a judicial admission. We reject these arguments, and accordingly affirm the decision of the circuit court.

## I.

## BACKGROUND

The complainant before the Commission, Kyu Chong Rowing ("Rowing"), was born in Korea and became a naturalized United States citizen in 1995. Rowing stands five-feet, one-inch tall, and weighs 105 pounds. On May 11, 1990, she was hired by Wheeling–Pittsburgh as a probationary employee under an on-the-job training program administered under the Job Training Partnership Act ("JTPA" or the "Act"), 29 U.S.C. §§ 1501, *et seq.*

At the time she was hired, it was anticipated that Rowing would work for 520 hours as a probationary employee, or the equivalent of 13 weeks. During that period, she would be rotated to various departments and allowed to perform a variety of tasks related to Wheeling–Pittsburgh's steel-manufacturing process.

Rowing was initially assigned to Wheeling–Pittsburgh's coke plant at Follansbee, West Virginia. Her work there consisted primarily of shoveling coke onto a conveyor belt. Shortly thereafter, Rowing was assigned to an oxygen furnace located in Mingo Junction, Ohio, where she was given the tasks of sweeping floors and assisting in the laying of cement. Upon reassignment to the coke plant, Rowing was instructed to open a "chuck door"—an approximately nine-foot tall door through which a leveling bar is inserted to remove excess coal. A fellow employee demonstrated the technique one time before leaving Rowing with the task. Rowing took approximately five-to-ten minutes to open the door, but nevertheless completed the job. Monte Smith, who had previously worked the job of opening the chuck doors, later testified that it would take more than 10 or 20 minutes to become proficient in operating the doors. Rowing was apparently never given an additional opportunity to become more skillful at the task.

Rowing resumed the job of shoveling coke and worked until July 5, 1990, when she was called to the personnel office and told by Brian Morrow that she was being terminated because of her small size. She had worked only 280 of the 520 hours that the JTPA contract required. The record indicates that Rowing was never informed of any shortcomings in her work prior to termination.

After her termination by Wheeling–Pittsburgh, Rowing pursued a grievance under procedures adopted by the Northern Panhandle Private Industry Council ("NPPIC"), the local entity responsible for administering JTPA programs.[1] Rowing followed the

---

1. Although not properly part of the administrative record (see note 7, *infra*), these grievance procedures are outlined in a document that

Wheeling–Pittsburgh belatedly submitted to the circuit court:

grievance process through Level III, where her claim of national-origin discrimination was rejected in May 1991 following an informal hearing. Rather than appealing the grievance determination to the Governor as permitted by federal regulations, Rowing filed a complaint with HRC on April 25, 1991, alleging that Wheeling–Pittsburgh discriminated against her on the basis of national origin in violation of W. Va.Code § 5–11–9(1).

A hearing was conducted before an administrative law judge ("ALJ") on June 15, 1995. The Commission's evidence at the hearing focused primarily on proving that Rowing was treated differently from similarly-situated, American-born employees.

Linda Carter, who was a probationary employee in 1978, testified that when she was unable to clean the chuck doors on the coke oven because of her short height, she was transferred to the machine shop rather than fired. Another Wheeling–Pittsburgh employee, Kathryn Woods, stated that when she was a probationary employee in 1979 she was assigned to work with heavy sheets of steel. When Woods could not perform this task because of her size, she was moved to the shipping department. Woods further testified that Wheeling–Pittsburgh "moved everyone around until they could find a job they could do good."

Burla Williams, Wheeling–Pittsburgh's Superintendent of Human Resources at the time Rowing was employed,[2] stated that it was routine practice to give new employees "every chance possible during the probationary period." Evidence relating to other probationary employees who were terminated indicated that they were given several warnings prior to being let go. Williams further

---

**NORTHERN PANHANDLE PRIVATE INDUSTRY COUNCIL**
*Job Training Act Participants*
*Grievance Procedure*

All JTPA program participants have the right to file a grievance (JTPA Regulations 629.52, 629.53 and Section 144 [29 U.S.C. § 1554] of the Job Training Partnership Act). It must be filed within one year of the date the incident occurred.

*Grievance:* An actual or supposed circumstance regarded as just cause for protest or complaint.

*Step 1:* The person having the complaint shall discuss it with his/her immediate supervisor/instructor within two (2) work days of becoming aware of the alleged occurrence. Supervisor/Instructor shall give a written response to grievant within three (3) work days. A copy of the response shall be sent to Complaints Officer, Northern Panhandle Private Industry Council, ....

Grievant accepts the decision or proceeds to:

*Step 2:* Grievant requests an investigation from the Northern Panhandle Private Industry Council within two (2) work days. An investigator will be assigned by the Northern Panhandle Private Industry Council staff to review and/or investigate the complaint. An informal conference will be arranged between the grievant and the subsponsor within two (2) work days. A written response of the findings and/or resolutions will be sent to both parties within three (3) work days.

Grievant accepts the decision or proceeds to:

*Step 3:* Written JTPA Grievance Form and the responses from Steps 1 and 2 are sent by the grievant within two work days to:

Complaints Review Officer
Northern Panhandle Private Industry Council
    ....

The Complaints Review Officer will review the complaint in a final attempt to reach an informal resolution. If an informal resolution cannot be reached, an Informal Hearing will be provided within thirty (30) days from the filing of the complaint. A written decision is rendered to all parties within sixty (60) days.

*Appeal:* The decision of the Northern Panhandle Private Industry Council may be appealed within ten days from the date a decision is rendered by writing and requesting a review by the Governor to:

State of West Virginia
Office of the Governor
112 California Avenue
Charleston, WV 25305

If a written decision is not provided within sixty (60) days, the grievant has a right to request a review by the Governor within ten (10) days from the date a decision should have been rendered by writing to the above address. Complaints alleging discrimination may be filed directly within 180 days with:

U.S. Department of Civil Rights
Room N–4123
200 Constitution Avenue N.W.
Washington, DC 20210

2. Williams was apparently on vacation at the time Rowing was fired by her assistant, Brian Morrow. She indicated that upon returning she was "shocked and ... felt bad" about Rowing's termination "because I felt she would do a good job and that she would make a good employee." Williams stated that she "would have given her [Rowing] more chances to prove herself."

testified that during the 12 years preceding Rowing's firing, very few probationary employees were terminated—and then only for drug abuse, disciplinary problems, or the inability to properly perform any assigned task after being given several opportunities. Moreover, she stated that to her knowledge, no one had ever been terminated because they were too short or did not weigh enough.

Evidence was also presented concerning the reaction of other Wheeling–Pittsburgh employees to Rowing's Korean origin. Rowing testified that she was questioned about her national origin and asked whether she was Vietnamese. Monte Smith, co-chair of the union civil rights committee, testified that he had heard other employees use derogatory slang terms to refer to persons of Asian ancestry.

Wheeling–Pittsburgh's evidence before the ALJ was in the form of several documents admitted by stipulation. The most significant of these documents were three evaluations made by Rowing's supervisors, which indicated that she was physically too small to perform many of her assigned duties. Evidence adduced at the hearing indicated that Rowing was never shown or informed about these adverse evaluations at the time of her termination.

The ALJ issued a decision on December 20, 1996, concluding that Wheeling–Pittsburgh had unlawfully discriminated against Rowing based upon national origin. Specifically, the ALJ found that Wheeling–Pittsburgh had failed to meet its burden of production. Alternatively, the ALJ determined that Wheeling–Pittsburgh's proffered reason for firing Rowing—her short stature—was pretextual based upon the experiences of similarly situated workers. The ALJ's findings were sustained by the Commission with minor modification in a final order issued on July 28, 1997.

Wheeling–Pittsburgh sought judicial review of HRC's decision in the Circuit Court of Kanawha County pursuant to W.Va.Code § 29–5–4 (1998). The circuit court denied relief by an order entered October 26, 1998, and this appeal followed.

## II.

### STANDARD OF REVIEW

Judicial review of HRC's disposition of Rowing's discrimination complaint is governed by the West Virginia Administrative Procedures Act ("APA"), W. Va.Code ch. 29A. The scope of judicial review in contested cases [3] is delineated by the APA:

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because of the administrative findings, inferences, conclusions, decision or order are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedures; or

(4) Affected by other error of law; or

(5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va.Code § 29A–5–4(g) (1998); see Syl. pt. 1, Clark v. West Virginia Bd. of Med., 203 W.Va. 394, 508 S.E.2d 111 (1998); Syl. pt. 1, HCCRA v. Boone Mem'l Hosp., 196 W.Va. 326, 472 S.E.2d 411 (1996). Although limited, judicial review of a contested case must nevertheless be careful, thorough, and probing.

3. The APA provides for judicial review in "contested·cases," W. Va.Code § 29A–5–4(a), which is defined as "a proceeding before an agency in which the legal rights, duties, interests or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing, but does not include cases in which an agency issues a license, permit or certificate after an examination to test the knowledge or ability of the applicant where the controversy concerns whether the examination was fair or whether the applicant passed the examination and does not include rule making," W. Va.Code § 29A–1–2(b) (1982).

■ Review is limited to the record made before the administrative agency, and a circuit court is authorized to accept additional evidence only where there is an allegation of procedural irregularity. W. Va.Code § 29A–5–4(f). Since a circuit court is therefore essentially discharging an appellate function little different from that undertaken by this Court, our review of a circuit court's affirmance of agency action is *de novo*, with any factual findings made by the lower court in connection with alleged procedural defects being reviewed under a clearly erroneous standard.[4]

■ In undertaking *de novo* review, we are bound to employ the same standard that the APA imposes upon the circuit courts. *See Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) ("This Court reviews decisions of the circuit [court] under the same standard as that by which the circuit [court] reviews the decision of the ALJ."); *see also United States v. International Bhd. of Teamsters*, 170 F.3d 136, 142 (2d Cir.1999) (" 'we give no deference to the lower court [but] review *de novo* whether the agency action satisfies the standards of the APA. In other words, [like the district court,] we review the record to determine whether the agency considered the relevant factors and acted within its discretion.' ") (quoting *Aquarius Marine Co. v. Pena*, 64 F.3d 82, 87 (2d Cir.1995)) (alterations in original).

> On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4[ ] and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

4. Our standard of review in cases involving a circuit court's modification of administrative action goes one step further:
> In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an

## III.

## DISCUSSION

### A.

### Effect of JTPA Grievance

Wheeling–Pittsburgh presents three closely-related arguments supporting its assertion that HRC is barred from acting on Rowing's complaint. First, it argues that the grievance procedure outlined in Rowing's employment contract was the functional equivalent of an arbitration clause, and therefore provides an exclusive remedy. Second, Wheeling–Pittsburgh maintains that HRC is precluded from considering Rowing's claim because she failed to exhaust, or abandoned the grievance procedure by not appealing the decision of NPPIC. Lastly, it asserts that consideration of Rowing's discrimination claim is barred under the doctrines of claim and issue preclusion based upon the grievance decision of NPPIC. We consider these arguments in turn.

### 1. Exclusiveness of Grievance Procedure.

■ Wheeling–Pittsburgh's central argument is that both federal law and its employment contract with Rowing provide an exclusive remedy in the form of a grievance process. The fatal flaw in this argument, however, is that neither the JTPA nor the documents executed by Rowing at the time of her employment even remotely suggest that the grievance procedures are exclusive.

Rowing was employed by Wheeling–Pittsburgh in connection with an on-the-job training program administered by NPPIC pursuant to the JTPA. Under the JTPA, the United States Department of Labor ("DOL") disburses job training grants to individual states in accordance with the terms of agreements entered into between the Secretary of DOL and the governors of each state. In West Virginia, the Bureau of Employment Programs ("BEP") acts for the

administrative law case under an abuse of discretion standard and reviews questions of law *de novo*.
Syl. pt. 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996); *see also Clark*, 203 W.Va. at 396, 508 S.E.2d at 114.

Governor and is the initial recipient of JTPA grant funds. BEP distributes the funds to "service delivery areas," which are geographic regions of the state designated by the Governor pursuant to the Act. *See* 29 U.S.C. §§ 1511–1512 (1994). NPPIC is responsible for administration of JTPA programs within a service delivery area covering six counties in the northern panhandle of West Virginia. As a subrecipient of JTPA funds, NPPIC in turn enters into subcontracts with private and public entities (such as Wheeling–Pittsburgh) to deliver job-training services.

The JTPA requires state entities designated to receive grant money and administer job training plans—in this case NPPIC—to establish and maintain grievance procedures for resolving complaints. 29 U.S.C. § 1554(a) (1994); *see also* 29 U.S.C. § 1513 (1994). Recipients of financial assistance who employ program participants are likewise required to establish and maintain a grievance procedure relating to the terms and conditions of employment. 29 U.S.C. § 1554(b) (1994). Federal regulations implementing these requirements were, at the time Rowing pursued her grievance, set forth at 20 C.F.R. §§ 629.51–629.53 (1990), 54 Fed.Reg. 39,118, 39,136 (Sept. 22, 1989).[5] Wheeling–Pittsburgh apparently chose to discharge its responsibility to provide a grievance mechanism pertaining to terms and conditions of employment by utilizing the grievance procedure established by NPPIC, as it was authorized to do under 20 C.F.R. § 629.53(b).

· While the JTPA clearly obligates recipients of program funding to establish grievance procedures, nothing in the statute or its implementing regulations suggest that such procedures preempt or otherwise limit the pursuit of claims falling outside the scope of the Act. Indeed, any such inference is negated by the express language of 20 C.F.R. § 629.51(b) (1990):

*Non–JTPA remedies.* Whenever any person, organization or agency believes that a Governor, SDA grant recipient, title III substate grantee or other subrecipient has engaged in conduct that violates the Act and that such conduct also violates a Federal statute other than JTPA, or a State or local law, that person, organization or agency may, with respect to the non-JTPA cause of action, institute a civil action or pursue other remedies authorized under other Federal, State, or local law against the Governor, SDA grant recipient, title III substate grantee or other subrecipient *without first exhausting the remedies in this subpart.* Nothing in the Act or his chapter shall:

(1) Allow any person or organization to join or sue the Secretary with respect to the Secretary's responsibilities under JTPA except as exhausting the remedies in this subpart;

(2) Allow any person or organization to file a suit which alleges a violation of JTPA or these regulations without first exhausting the administrative remedies described in this subpart; or

(3) Be construed to create a private right of action with respect to alleged violations of JTPA or the JTPA regulations.

(Emphasis added.)[6] If a program participant is not required to first exhaust his or her grievance remedies before pursuing a non-JTPA claim, then the grievance procedure established by the Act obviously does not create an exclusive remedy with respect to such claims. Consequently, we find that the grievance procedures established by the JTPA do not preempt or otherwise forestall a claim of discrimination under the Human Rights Act. *See Anne Lind & Assoc. v. Orleans Private Indus. Council,* 673 So.2d 227, 233 (La.Ct.App.1996) ("by the clear and express language of the act ... the JTPA grievance procedures do[ ] not foreclose other legal remedies available ... under appli-

---

**5.** These regulations were revised and recodified in 1994, 59 Fed.Reg. 45760 (Sept. 2, 1994), and are now set forth at 20 C.F.R. § 627.500–627.504 (1998).

**6.** This provision is presently set forth in substantially the same form at 20 C.F.R. § 627.500(d)

(1998). Significantly, the revised regulations on this subject also state that "[n]othing contained in this subpart shall be deemed to prejudice the separate exercise of other legal rights in pursuit of remedies and sanction available outside the Act." 20 C.F.R. § 627.500(a) (1998).

cable law") (citing 20 C.F.R. § 627.500(a) (1996)) (emphasis removed).

We likewise fail to detect anything in the documents executed by Rowing at the time of her employment that could be construed as binding her to the grievance process.[7] These documents are completely silent on the issue of whether the grievance process is an exclusive remedy, and Wheeling–Pittsburgh has not directed us to anything in the record suggesting otherwise.

Moreover, even if we were faced in this case with an employment contract that, standing alone, mandated an exclusive grievance process, it would obviously run afoul of authority prohibiting the contractual negation of remedies arising under the Human Rights Act. In *Copley v. NCR Corp.*, 183 W.Va. 152, 394 S.E.2d 751 (1990), an employee alleged age and sex discrimination and the employer moved to compel arbitration under the terms of his individual employment contract. We stated in Syllabus point 2 of *Copley* that "[u]nder West Virginia law, an arbitration clause in an employment contract cannot defeat a human rights action filed by the claimant pursuant to W. Va.Code, 5–11–13(b) (1983)." *Copley* is directly on point in this case, where Wheeling–Pittsburgh argues that the employment contract contained the functional equivalent of an arbitration provision. Consequently, even if such a provision were contained in the employment contract, it would not be binding under what is now well-settled West Virginia law.

### 2. Exhaustion of Grievance Process.

Wheeling–Pittsburgh also asserts (apparently in the alternative) that Rowing's claim under the Human Rights Act is barred by her failure to exhaust the administrative remedies provided by the JTPA. Specifically, it notes the fact that after receiving an unfavorable determination from NPPIC, Rowing did not request review from the Governor as then permitted under 20 C.F.R. § 629.52(c)(1) (1990).

As indicated by the foregoing discussion, however, DOL regulations unequivocally state that exhaustion of the grievance process is not a prerequisite for recourse to non-JTPA remedies. Consequently, there is no federal requirement that an employee must exhaust his or her grievance remedies prior to pursuing a state-law claim.

A potentially more compelling argument, which is only obliquely advanced by Wheeling–Pittsburgh in its brief, is that because Rowing initially chose to commence JTPA grievance proceedings, she was bound to follow such remedial course to its completion before pursuing a complaint before the Commission. Wheeling–Pittsburgh emphasizes our holding in Syllabus point 6 of *Ewing v. Board of Educ. of County of Summers*, 202 W.Va. 228, 503 S.E.2d 541 (1998):

When an individual is adversely affected by an educational employment decision rendered pursuant to W. Va.Code § 18A–4–7a (1993) (Repl.Vol.1997), he/she may obtain relief from the adverse decision in one of two ways. First, he/she may request relief by mandamus as permitted by W. Va.Code § 18A–4–7a. In the alternative, he/she may seek redress through the educational employees' grievance procedure described in W. Va.Code §§ 18–29–1 to 18–29–11 (1992) (Repl.Vol.1994). *Once an employee chooses one of these courses of relief, though, he/she is constrained to follow that course to its finality.*

(Emphasis added). *Ewing* involved a circumstance where two related statutes provided overlapping remedies—a grievance procedure and mandamus—for claims pertaining

---

7. Some of the documents that Wheeling–Pittsburgh apparently relies upon, including the summary of the grievance process quoted in note 1, *supra*, are not part of the administrative record. Instead, these documents were tardily submitted to the circuit court after the Commission rendered its final decision. Judicial review is limited to the record made before the agency. W. Va.Code § 29A–5–4(f) (1998) ("[t]he review ... shall be upon the record made before the agency"). In this case, moreover, Wheeling–Pitts- burgh made no attempt below to supplement the administrative record. Consequently, although supplementation is permitted under a limited set of circumstances, *e.g. Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697, 703–4 (9th Cir.1996), Wheeling–Pittsburgh made no attempt to do so, and we therefore do not consider these documents. In any event, we observe that there is nothing in these documents supporting Wheeling–Pittsburgh's exclusivity argument.

to employment decisions made by boards of education. In concluding that the employee could not pursue mandamus while at the same time maintaining a grievance, we reasoned that to permit such simultaneous recourse to these remedies "would emasculate the grievance procedure as it is presently structured" by allowing the grievant to systematically seek extraordinary relief anytime he or she encountered an unfavorable determination in the grievance process. 202 W.Va. at 238–39, 503 S.E.2d at 551–52.

We are not persuaded that our reasoning in *Ewing* applies to the present case. In *Ewing*, we were attempting to reconcile two statutes that provided potentially conflicting remedies with respect to enforcement of the same substantive rights. Here, by contrast, the grievance process that Rowing purportedly abandoned was never intended to provide a remedy for a discrimination claim based on state law.[8] Moreover, there is nothing in the administrative record indicating that Rowing was ever made aware of the fact that she could appeal NPPIC's grievance decision to the Governor.[9] Consequently, we reject the argument that Rowing was required to exhaust the grievance process prior to bringing a claim before the HRC.

### 3. Claim and Issue Preclusion.

Wheeling–Pittsburgh further asserts that Rowing's discrimination claim is barred

under the doctrines of claim and issue preclusion based upon the earlier grievance decision of NPPIC.

It is now well established that "the doctrine of res judicata may be applied to quasi-judicial determinations of administrative agencies." *Rowan v. McKnight,* 184 W.Va. 763, 764, 403 S.E.2d 780, 781 (1991) (per curiam) (citing *Liller v. West Virginia Human Rights Comm'n,* 180 W.Va. 433, 376 S.E.2d 639 (1988)). The standard by which this Court determines the preclusive effect of administrative adjudications is set forth in Syllabus point 2 of *Vest v. Board of Educ. of Nicholas County,* 193 W.Va. 222, 455 S.E.2d 781 (1995):

> For issue or claim preclusion to attach to quasi-judicial determinations of administrative agencies, at least where there is no statutory authority directing otherwise, the prior decision must be rendered pursuant to the agency's adjudicatory authority and the procedures employed by the agency must be substantially similar to those used in a court. In addition, the identicality of the issues litigated is a key component to the application of administrative *res judicata* or collateral estoppel.

*See also* Syl. pt. 3, *Asaad v. Res–Care, Inc.,* 197 W.Va. 684, 478 S.E.2d 357 (1996) (per curiam).

In 1993, after Rowing had removed herself from the grievance process, DOL issued 29 C.F.R. part 34. These regulations require recipients of JTPA funding to adopt procedures for processing discrimination complaints, 29 C.F.R. § 34.42 (1998), and give complainants the option of filing their initial complaint with either the recipient, or the Director of DOL's Directorate of Civil Rights, 29 C.F.R. § 34.43(b). Notably, if the complainant elects the former course and is dissatisfied with the result, he or she may subsequently file a complaint directly with the Director. 29 C.F.R. § 34.43(f)(1)–(3). This process is now apparently the exclusive means of pursuing a discrimination complaint under § 1577 of the JTPA. *See* 20 C.F.R. § 627.500(b) (1998).

---

8. Significantly, it is not entirely clear that the grievance process was an appropriate forum to pursue a discrimination claim under the JTPA. The Act expressly prohibits any recipient of program funding from discriminating on the basis of race, color, religion, sex, national origin, age, disability, or political affiliation or belief. 29 U.S.C. § 1577(a) (1994). Earlier regulations implementing the grievance-procedure requirement of the JTPA suggest an intent to channel discrimination claims onto a separate administrative track: "Complaints of discrimination pursuant to section 167(a) of the Act will be handled under 29 C.F.R. parts 31 and 32." 20 C.F.R. § 629.51(a) (1990). Under 29 C.F.R. parts 31 and 32, an employee of a grant recipient who chooses to bring a discrimination claim based on federal law may file a complaint directly with DOL within 180 days of the alleged discrimination. *See* 29 C.F.R. § 31.7(b) (1998). Not coincidentally, two documents acknowledged by Rowing at the time she was hired by Wheeling–Pittsburgh set forth precisely the same procedure with respect to discrimination claims.

9. While the administrative record contains a document where Rowing apparently acknowledges receipt of a "Participant Grievance Procedure," the underlying document was never offered during administrative proceedings and is therefore not part of the administrative record in this case. *See* notes 1 & 7, *supra.*

In *Vest*, we addressed the question of whether a decision rendered by the West Virginia Education and State Employees Grievance Board with respect to a gender-based discrimination claim precluded the grievant from subsequently pursuing a claim under the Human Rights Act. In holding that such administrative disposition of the discrimination claim did not have preclusive effect, the Court concluded, in part,[10] that "[t]he procedures employed by the Grievance Board are not substantially similar to those employed by either a court of law or the [HRC]." *Vest*, 193 W.Va. at 227, 455 S.E.2d at 786. We discussed the factors supporting this conclusion at length:

> [T]he Legislature designed the grievance process to be simple and expeditious. Consequently, the process is streamlined and lacks many of the adversarial accouterments found in judicial and Commission's proceedings. In the vast majority of grievances, for example, the grievant is not represented by a lawyer. Moreover, and more importantly, the grievance process does not provide for any of the discovery mechanisms available under the Rules of Civil Procedure and the Commission's procedural rules. Finally, in stark contrast to the Human Rights Act, the grievance statute does not provide for the right to an independent investigation of each grievance filed before the Board, does not make available at public expense representation by a lawyer for cases that proceed to a hearing before an administrative law judge, and does not give employees the option of skipping the administrative process and pursuing their claims *de novo* in circuit court where jury trials and the full array of legal and equitable remedies are obtainable.
>
> The issues in a human rights case—especially unlawful motive and disparate impact—are extremely difficult and often complex. Invariably, they require sub-

stantial degrees of fact gathering and familiarity with the concepts of discrimination law. A grievant without a lawyer could not possibly be expected to grasp the significance of that law, put together a case of discrimination, and comprehend the full impact of claim and issue preclusion doctrines. A grievant with a lawyer would have an unfairly difficult task trying to prove illicit motive or· disparate impact without access to the full panoply of discovery opportunities. The problem especially is apparent by the fact that in matters of motive and disparate impact the employer ordinarily possesses the crucial evidence. Thus, in the language of Syllabus Point 3, in part, of *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 359 S.E.2d 124 (1987), the plaintiff in this case was not "afforded a full and fair opportunity to litigate the matters in dispute[.]"

*Vest*, 193 W.Va. at 227, 455 S.E.2d at 786.

The facts of this case are not significantly distinguishable from those that shaped our decision in *Vest*. Although Wheeling–Pittsburgh asserts in its briefs that Rowing had various discovery devises at her disposal, including the right to obtain documents and the ability to subpoena witnesses, we have found nothing in the record to support such assertions.[11] The federal regulation in place at the time of Rowing's grievance suggests nothing more than a rudimentary, informal process: "The grievance hearing procedures shall include written notice of the date, time and place of the hearing, an opportunity to present evidence, and a written decision." 20 C.F.R. § 629.52(b)(2) (1990).[12]

In short, Wheeling–Pittsburgh has failed to demonstrate that the procedures employed by NPPIC in any way afforded Rowing a "full and fair opportunity to litigate" her discrimination claim. Consequently, we reject the argument that the grievance deci-

---

**10.** The Court in *Vest* also determined that there was no identicality of issues, based upon the fact that questions of illicit motive and disparate impact were not before the Grievance Board.

**11.** Although not properly part of the administrative record and therefore outside of our consideration (*see* notes 1 & 7, *supra*), we note that the

description of the process employed at Level III—the point at which Rowing terminated her participation in the grievance process—fails to indicate anything approximating the formal trial-like procedures employed by HRC.

**12.** Current regulations are no more demanding. *See* 20 C.F.R. § 627.502(b) (1998).

sion precluded Rowing from subsequently pursuing her claim before the Commission.

## B.

### Wheeling–Pittsburgh's Burden of Production

■ Wheeling–Pittsburgh further contends that the Commission erroneously concluded that it failed to meet its burden of producing evidence that Rowing was terminated for a legitimate, nondiscriminatory reason. While we agree with Wheeling–Pittsburgh that it sustained its burden of production in this case, we nevertheless conclude that the Commission's error is harmless in light of substantial evidence supporting its alternative finding that the explanation offered by Wheeling–Pittsburgh for Rowing's termination was pretextual.

In proceedings before the ALJ, the parties stipulated to the introduction of numerous documents, including evaluation forms completed by three of Rowing's supervisors. These evaluations indicated that Rowing had physical difficulty performing certain job functions. One supervisor, who provided an otherwise favorable recommendation, stated that she was "small, not very strong for any heavy work." Another commented that Rowing "could not work groundman or ladle liner helper because she could not lift the hook or flip over boles [sic] of clay, had to call out other people to do her job." The third evaluation concluded that she was "[p]hysically too small—may have language problem with English—she is too short clean jambs [sic] or open chuck doors ...." Each of the latter two evaluations rated Rowing as "poor" in the categories of physical adaptability and quantity of work.

Notwithstanding the stipulated admission of these documents into evidence, the ALJ in reliance on Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), concluded that Wheeling–Pittsburgh "failed to clearly and specifically set forth the reason for ... [Rowing's] discharge from employment. In fact, it did not even address this issue or offer any articulated reason for her termination." In adopting the final order of the ALJ, the Commission deleted this language and substituted the following:

Although respondent [Wheeling–Pittsburgh] presented documentary evidence at the hearing, including three employee evaluations, the respondent presented no witnesses to articulate a reason for complainant's [Rowing's] discharge. Although the respondent has specified a reason for the complainant's termination in pleadings in this matter, "the defendant cannot meet its burden merely by an answer to the complaint or by argument of counsel." Burdine, 450 U.S. at 255 n. 9 [, 101 S.Ct. at 1094 n. 9, 67 L.Ed.2d at 216 n. 9]. Not only did the respondent fail to examine any witness who could testify as to the reasons for the complainant's termination from employment, it did not even cross-examine the complainant or any of the witnesses whose testimony established a prima facie case that the respondent discriminated against the complainant.

Significantly, the ALJ's final order (as adopted by HRC) did not stop with a conclusion that Wheeling–Pittsburgh failed to meet its burden of production, but went on to find that Rowing had demonstrated that the offered explanation for dismissal was pretextual, and that she had met her ultimate burden of proving discriminatory motive.

The Human Rights Act makes it "an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions, or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or handicapped...." W. Va.Code § 5–11–9(1) (1998). "The term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, age, blindness, handicap, or familial status and includes to separate or segregate[.]" W. Va.Code § 5–11–3(h) (1998).

■ Claims of disparate treatment under the Human Rights Act are governed by the familiar three-step evidentiary frame-

work outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973), and *Burdine.* Under the *McDonnell Douglas/Burdine* structure

"First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' .... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Shepherdstown Volunteer Fire Dep't v. State ex rel. West Virginia Human Rights Comm'n,* 172 W.Va. 627, 637, 309 S.E.2d 342, 352 (1983) (quoting *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093, 67 L.Ed.2d at 215); *see also Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 483, 457 S.E.2d 152, 160 (1995); *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986). If the defendant is silent in the face of the plaintiff's prima facie case, then judgment must be entered in favor of the latter. *Barefoot,* 193 W.Va. at 483, 457 S.E.2d at 160 (citing *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95, 67 L.Ed.2d at 216–17); *West Virginia Univ./West Virginia Bd. of Regents v. Decker,* 191 W.Va. 567, 571 n. 3, 447 S.E.2d 259, 263 n. 3 (1994).

As explained by the United States Supreme Court in *Burdine,* at the second stage of the order of proof, the employer "bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." 450 U.S. at 260, 101 S.Ct. at 1097, 67 L.Ed.2d at 219. Such explanation must be presented in the form of admissible evidence, and the burden cannot be met "merely through an answer to the complaint or by argument of counsel." *Id.* at 255 & n. 9, 101 S.Ct. at 1094 & n. 9, 67 L.Ed.2d at 216 & n. 9.

Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by

presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of defendant's evidence should be evaluated by the extent to which it fulfills these functions. *Id.* at 255–56, 101 S.Ct. at 1095, 67 L.Ed.2d at 216–17.

▊▊▊▊ The Commission in this case effectively required Wheeling–Pittsburgh to demonstrate through direct evidence that it actually relied upon the proffered evidence in making its employment decision. This is too heavy a burden. The evidence introduced to satisfy the defendant's burden of production may be in the form of circumstantial evidence tending to prove the existence of a nondiscriminatory motive. *See Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1011–12 (11th Cir.1984) ("*Burdine* does not require that the evidence of the defendant's reasons for ... [the adverse employment decision] be direct"). Moreover, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216 (citation omitted); *see Shepherdstown,* 172 W.Va. at 637, 309 S.E.2d at 352–53. We are persuaded that the employee evaluations submitted by Wheeling–Pittsburgh created a genuine issue of fact as to whether Rowing's termination was the result of intentional discrimination. *See State ex rel. West Virginia Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency,* 174 W.Va. 711, 720, 329 S.E.2d 77, 86–87 (1985) (introduction of employee personnel file indicating poor attendance and work performance sufficient to meet employer's burden of production); *see also Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1513 (D.C.Cir.1995) (employer met burden of production by offering employee evaluations). Also, the clarity and specificity of Wheeling–Pittsburgh's explanation for the termination is demonstrated by the fact that the Commission put forward considerable evidence refuting the allegation that Rowing was physically unable to per-

form her assigned tasks, as well as proof demonstrating that other probationary employees of limited strength and stature were reassigned to other, more appropriate jobs. Consequently, we hold that the Commission erred as a matter of law in determining that Wheeling–Pittsburgh failed to meet its burden of production.

■ But our analysis does not end here. The Commission also concluded in the alternative that the asserted reason for Rowing's termination was pretextual and that she had sustained her burden of proving that Wheeling–Pittsburgh acted with discriminatory motive. If based upon substantial evidence, such a finding renders the Commission's error harmless. *See Locke v. Kansas City Power & Light Co.,* 660 F.2d 359, 365 (8th Cir.1981) (holding that while district court had imposed too heavy a burden with respect to employer's burden of production, error was harmless because record supported lower court's finding that alleged reasons for not hiring plaintiff were pretextual).

The final order entered by the ALJ contains an extensive discussion supporting the finding that Wheeling–Pittsburgh's asserted reason for Rowing's termination was pretextual:

> [T]he complainant and the complainant's witnesses offered evidence which completely discredits any inference that complainant was terminated as a result of the comments contained on the evaluations. For example, Burla Williams, former Superintendent of Human Resources at Wheeling–Pittsburgh Steel Corp., testified for the complainant. Ms. Williams was the person in charge of terminating probationary employees. Ms. Williams testified that complainant's evaluations and the comments contained therein alone would not have given her reason to terminate the complainant. When asked whether she would have terminated complainant when Brian Morrow terminated her, Ms. Williams stated: "No, because I only had two evaluations that were in my file prior to going on vacation ... and it wasn't anything that would have given me reason to terminate her. I would have given her more chances to prove herself."

The Commission brought on several other witnesses who testified about the complainant's ability to perform her job. Ms. [Kathryn] Woods, for example, testified that she had observed complainant working on the job. When asked how she (Ms. Woods) would characterize the complainant as a worker she stated[:] "She was as good a worker as I would be. She was a good worker, I felt. She was better than me even." Monte Smith stated that he also had an opportunity to observe complainant working on the job. When Mr. Smith was asked how he would characterize complainant as a worker, he stated that "she was a good worker. She works all the time."

> .... In the case at bar, even if the respondent had clearly and specifically alleged that the complainant was unable to physically perform her job because she lacked the physical size, witness testimony that other similarly situated American-born employees were not terminated for the same reason, convincingly establishes that the respondent's explanation for complainant's termination ... [was] pretextual.

> Burla Williams testified that no one had ever been terminated by the respondent because they were too short or did not weigh enough. Supporting this fact, both Kathy Woods, 5' 0", and Linda Carter, 4' 8", testified that they were physically unable to perform certain jobs as probationary employees and that, as a result, they were transferred around to other jobs which they could more easily perform. Both women are American-born. Ms. Williams distinguished the complainant's termination from that of two other probationary employees who were terminated after a series of warnings about their workplace deficiencies.... Burla Williams also stated that it was the normal procedure at Wheeling Pittsburgh Steel Corp. to give employees "every chance possible during the probationary period" to prove that they could perform a job and that they were always given more than one or two chances to prove that they could do a job.

> ....

On one of complainant's evaluation forms, a manager for the respondent stated that she (Ms. Rowing) was too short to perform the chuck door job. Linda Carter testified that, as a probationary employee, she was too short to clean and open the chuck doors, but that the respondent simply transferred her to another job when it determined that she couldn't do the job. Since there was undisputed testimony that complainant could physically perform every job to which she was assigned; that other probationary employees who were unable to perform certain jobs were simply transferred to other jobs rather than terminated; and that other probationary employees were only terminated after many warnings, it is clear than any defense that complainant could not perform her job is pretextual.

. . . .

By a preponderance of the evidence, the Commission and complainant have shown that because of complainant's accent and ... [Asian] ancestry ... she was treated differently than native born, similarly situated employees. Complainant has met her ultimate burden in showing that her termination was a violation of the West Virginia Human Rights Act.

▮▮▮▮▮ As we have consistently stated, the "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syl. pt. 1, *West Virginia Human Rights Comm'n v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981); *see also* Syl. pt. 5, *Logan–Mingo Area Mental Health Agency, supra.* A determination that an employer's proffered reasons for termination are pretextual is sufficient to support a finding of discrimination: "The complainant may prevail if it is shown the reason presented by the respondent is merely a pretext for a discriminatory motive." Syl. pt. 3, *Mingo County Equal Opportunity Council v. State Human Rights Comm'n*, 180 W.Va. 240, 376 S.E.2d 134 (1988); *see also Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 73, 479 S.E.2d 561, 583 (1996) ("proof of pretext can by itself sustain a conclusion that the defendant engaged in unlawful discrimination"); Syl. pt. 3, *West Virginia Inst. of Technology v. West Virginia Human Rights Comm'n*, 181 W.Va. 525, 383 S.E.2d 490 (1989) ("The complainant will still prevail in a disparate-treatment employment discrimination case if the complainant shows by a preponderance of the evidence that the facially legitimate reason given by the employer for the employment-related decision is merely a pretext for a discriminatory motive."); *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217 (plaintiff "may succeed in ... [meeting the ultimate burden of proof] either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

Wheeling–Pittsburgh argues that the Commission's finding lacks substantial support in the record because two witnesses who testified to differential treatment—Kathryn Woods and Linda Carter—were probationary employees over a decade prior to Rowing's hiring. Although the experiences of these two witnesses were relatively remote in time, additional evidence was presented by Burla Williams' testimony indicating that Wheeling–Pittsburgh had a long-standing practice of shifting probationary employees to jobs for which they were qualified. Consequently, even taking the temporal disparity into account, we are nevertheless satisfied that there is substantial evidence in the administrative record supporting the Commission's conclusion that Wheeling–Pittsburgh's explanation for Rowing's termination was pretextual. Any error made by the Commission regarding Wheeling–Pittsburgh's burden of production was therefore harmless.

### C.

#### Judicial Admission

▮▮▮ Wheeling–Pittsburgh lastly asserts that the Commission improperly failed to treat a statement made by Rowing in her HRC complaint as a binding judicial admission. Specifically, it points to the following:

I was employed by the Respondent for approximately eight weeks. I was never reprimanded as to my performance. I was assigned to clean and open chuck doors. *Due to my size, I was unable to perform the assigned duties.*

(Emphasis added.) Wheeling–Pittsburgh argues that this statement should have precluded any evidence regarding Rowing's physical ability to perform her assigned duties.

 "A judicial admission is a statement of fact made by a party in the course of the litigation for the purpose of withdrawing the fact from the realm of dispute." Syl. pt. 4, *State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986). The significance of such an admission is that it " 'will stop the one who made it from subsequently asserting any claim inconsistent therewith.' " *Clark v. Clark,* 70 W.Va. 428, 433, 74 S.E. 234, 236 (1912) (citation omitted); *see also Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal."). However, only "deliberate, clear and unequivocal" statements of fact qualify as judicial admissions. *Matter of Corland Corp.,* 967 F.2d 1069, 1074 (5th Cir.1992) (citation omitted).

The statement at issue clearly was not—as Wheeling–Pittsburgh portrays it—an admission by Rowing that she could not physically perform *any* of the tasks to which she was assigned. Rather, it merely indicated that she had difficulty opening and cleaning the chuck doors.

Even in this regard, we are not inclined to require that a statement made in an administrative pleading be given conclusive effect where it is undisputed that such pleading was prepared by a non-lawyer, who cannot be presumed to know the possible consequences of a loosely-worded assertion of fact. We have not been pointed to, nor have we found, any authority supporting the contention that a statement made in an administrative filing must be construed as a judicial admission. This Court is apparently not alone. *See Granzow v. Eagle Food Centers, Inc.,* 27 F.Supp.2d 1105, 1107 n. 4 (N.D.Ill. 1998) (finding no authority for proposition that party was bound by statement made in verified response before EEOC). Thus, we hold that a statement made in an administrative complaint, before the West Virginia Human Rights Commission, may not be construed against the complainant as a judicial admission where evidence to the contrary is presented by the complainant.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Kanawha County upholding the action of the West Virginia Human Rights Commission is hereby affirmed.

Affirmed.